UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

KEISHA L. HORTON,

                                   Plaintiff,

                   -against-

ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,

                                   Defendant.

-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: March 30, 2021

1:19-CV-08944 (SN)

**OPINION & ORDER**

SARAH NETBURN, United States Magistrate Judge:

Plaintiff Keisha L. Horton seeks review of the decision of the Commissioner of Social Security (the "Commissioner") finding that she was not disabled or entitled to disability insurance benefits under the Social Security Act (the "Act"). The parties have cross-moved for judgment on the pleadings. For the reasons stated below, Horton's motion is GRANTED, and the Commissioner's motion is DENIED. The matter is REMANDED for further proceedings consistent with this opinion.

## BACKGROUND

### I.     Administrative Proceedings

Horton applied for disability insurance benefits on January 22, 2016. See Administrative Record ("R.") 85–86. She alleged disability following an October 14, 2015 car accident that resulted in back pain and limited her ability to walk, stand, and carry. Id. After her application was denied she requested a hearing before an administrative law judge ("ALJ"). R. 101–02. Horton appeared for a hearing before ALJ M. Reeves on September 17, 2018, and the ALJ

issued an unfavorable decision on November 19, 2018. R. 7–17. On July 31, 2019, the Appeals
Council denied Horton's request for review, making the ALJ's decision final. R. 1–3.

## II.     Horton's Civil Case

Horton filed her Complaint on September 26, 2019. See ECF No. 1. She requests that the
Court set aside the decision and grant her disability benefits or, alternatively, remand her case for
further proceedings, along with awarding attorney's fees and costs. Id. The Commissioner
answered by filing the administrative record, and the parties cross-moved for judgment on the
pleadings. See ECF Nos. 11, 14, 16.

Horton argues that the ALJ: (1) did not consider her need for a cane when evaluating her
ability to perform sedentary work; (2) failed to consider that her persistent efforts to obtain pain
relief bolstered her credibility; and (3) failed to properly evaluate the opinions of her treating
physicians. Horton also argues that the ALJ's decision was not supported by substantial
evidence. See ECF No. 12. The Commissioner counters that the ALJ's decision is free of legal
error and supported by substantial evidence and should be affirmed. See ECF No. 15 at 1. The
parties consented to my jurisdiction on January 23, 2020, pursuant to 28 U.S.C. § 636(c). ECF
Nos. 9, 10.

## III.    Factual Background

### A. Non-Medical Evidence

Horton was born July 20, 1973. R. 178. She is a high school graduate and most recently
worked from October 2004 to October 2015 as a milieu counselor at a non-profit organization,
helping to teach basic life skills to children with disabilities. R. 62–63; 182. Previously, she
worked for 10 years as a food services industry manager. R. 62.

### 1. Horton's Function Report

In her September 15, 2016 function report, Horton wrote that she lived in a home with her family. R. 188. She indicated that she was limited in her daily activities and could not sleep at night due to neck and back pain and spasms, as well as pain that traveled down her legs. R. 188–89. She could brush her teeth and took her medication with a slice of bread. R. 188. She also wrote that she took her then six-year-old daughter to school, that her daughter helped Horton when she was in pain, and that Horton's brother helped to care for her daughter. R. 189.

Horton wrote that, before to her accident, she could do laundry, engage in intimate relations, go for long walks, dress herself, clean her house, take a bath, cook a meal, and escort her daughter on outings—all of which she was now unable to do. R. 189. She needed assistance to dress and undress; needed help getting out of the bathtub; needed help washing and styling her hair; and needed assistance rising from the toilet. R. 189–90. She could feed herself, but this consisted of cold cereal, slices of bread, or cold sandwiches—otherwise her husband, daughter, brother, or aunt would cook for her. Id. Additionally, she also wrote that she could do light sweeping on occasion but needed assistance due to pain through her back and neck. R. 191.

Horton left the house two to three times weekly, to walk, drive, or ride in a car, but did not venture out alone, as her legs had buckled on more than one occasion. Id. She could shop with assistance and needed to sit every 10–15 minutes. Id. She could still listen to music, pray, and write every day, but engaged in these activities with less frequency than in the past. R. 192. She sometimes socialized with her immediate family but would most often go to her room to lay down because of pain. Id. Aside from these activities, she took her daughter to school and attended therapy, physical therapy, and other scheduled medical appointments. Id. She wrote that

she had shut many people out because she did not want to be seen in her condition which left her depressed and embarrassed. R. 193.

She could not lift more than 10 pounds and lifting in general hurt; standing hurt her neck and back; walking more than two blocks caused intense pain and required her to rest frequently; she shifted constantly while sitting, which caused pain in her neck and back; she climbed the 13 stairs to her home, but stated that it was painful; she could not kneel and had limited reaching, but could use her hands. R. 193–94. She could not finish tasks and had to take frequent breaks to lay down. R. 194. She indicated that stress made her neck pain worse. R. 195.

### 2. Hearing Testimony

At her September 17, 2018 hearing, Horton testified that she was injured in a motor vehicles accident on October 14, 2015, in which she was a passenger, for which she received worker's compensation payments. R. 54. Because of the injuries sustained in the accident, Horton stated she could drive approximately five minutes, twice per day, to drop off and pick up her daughter from her bus stop. R. 59–61. She was scared to drive, however, because of pain that shot through her neck and back, so she preferred to have her 19-year-old daughter or her brother drive and would sometimes switch driving with them within the five-minute trip. Id. She also stated that she could no longer clean her home, cook, or go on vacation, and she could not participate in her daughter's school activities. R. 60–61.

Horton recounted her work history and said that her daily pain—beginning in the morning and lasting through the evening—prevented her from working. R. 63. Her pain began in her neck, and radiated to her mid and lower back, then down to her legs, and she experienced numbness in her fingers and toes. R. 63–64. She took pain medication to manage her pain, which made her drowsy, dizzy, and gave her dry mouth; she could not drive while medicated. R. 64.

4

She additionally had several steroid injections to alleviate her pain but stated that she did not receive any relief. R. 64, 71. She had two spinal surgery consultations, but upon learning that her post-operative chance of walking was only 30%, decided the risk was too great. R. 64–65.

She estimated sleeping only three hours per night because of pain and back spasms. R. 65. In a typical day, she would wake her daughter, eat a premade meal, and drive her daughter to the bus stop. R. 65–66. She might try to make her bed, but it could take an hour and a half to two hours, and often she abandoned it. R. 66. She might get a cup of coffee and attempt to wash her small dishes, but with difficulty and pain. Id. She might take a nap on the couch for an hour or watch some television. R. 67. Afterward she would attempt to dress, though she often remained in her pajamas all day. Id. She picked up her daughter from the bus stop, and tried to help her with homework, although it was often a frustrating experience, with her daughter worried about her pain. R. 67–68.

Horton's husband and her eldest daughter shopped for groceries, cooked, and prepared meals in microwaveable bowls for her and her youngest daughter. R. 70. Horton's then eight-year-old daughter would heat up her own premade meals, and often heat her mother's food as well. R. 68. Her daughter would bathe, lay out her clothes, and prepare for bed on her own, with Horton's supervision. Id. After her daughter was asleep, Horton might doze briefly on the couch before being awakened by pain and would take medication. R. 69.

Horton attended physical therapy, though she stated she often felt more pain after her sessions. R. 70. She also saw a psychologist to help her cope with the ways the pain affected her life. R. 73. She could lift less than ten pounds, had limited overhead reaching, but could use her hands. R. 71. Sitting for extended periods increased tension and pain in her neck, which shot down her back, that she described as similar in intensity to "labor pains." R. 71. She could stand

5

for approximately 30 minutes, had troubling kneeling, crouching, bending at the waist, and climbing stairs. R. 73.

Dana Kirchinek, a vocational expert ("VE"), also testified at the hearing. R. 74–83. When asked to imagine a hypothetical person of Horton's age, education, work experience, and residual functional capacity, she testified that that person could do the work of a document preparer, a surveillance system monitor, and a credit checker. R. 75. She noted that those jobs could be performed by someone who required a cane for ambulation; if the cane was required for ambulation *and* balance, however, she could not perform any. R. 78.

### B. Treating Medical Evidence

#### 1. Jacqueline Kelderhouse, Nurse Practitioner

On October 14, 2015, Kelderhouse treated Horton at Montefiore MG Urgent Care following her accident. R. 542–549. She noted that Horton had been in a car crash and complained of back pain and a headache. R. 543. Her examination revealed point tenderness in Horton's mid-thoracic spine, and she prescribed her ibuprofen for pain. R. 544.

#### 2. Dr. Clifton Burt, MD

On December 21, 2015, Dr. Burt performed bilateral lumbar transforaminal epidural steroid injections at Horton's L2-L3, L3-L4, L4-L5 vertebrae, as well as lower lumbar trigger point injections. R. 245–55. His pre- and post-operative diagnoses indicated that Horton suffered from lumbar radiculopathy. Id.

On December 30, 2015, Horton saw Dr. Burt for cervical and lumbar spasms, tenderness, and decreased range of motion and pain. R. 252–53. She complained of 10 of 10 neck pain, radiating bilaterally to the shoulders, with bilateral weakness and numbness in her shoulders,

arms, and hands. Id. She had lumbar pain at 5 of 10, radiating bilaterally to her feet and buttocks. Id. Her pain worsened when standing, sitting, bending, sleeping, turning, and walking. Id.

Dr. Burt noted positive cervical compression on the right and positive straight leg raise ("SLR") on the right. Id. An MRI of the cervical spine revealed C3-4 disc-bulge and C4-5 disc herniation. Id. An MRI of Horton's lumber spine revealed T12-L3 disc herniation; L3-4, L4-5 disc-bulge; and T1-2, T4-5, T7-8 disc herniation. Id. He diagnosed Horton with cervical sprain/strain, lumbar sprain, lumbar radiculopathy, and thoracic radiculopathy. Id.

On January 19, 2016, Dr. Burt noted normal dermatomes of the C5 and C7 on the left but decreased on the right;[1] and normal at the L3, L4, and L5 vertebrae. R. 271. He noted Horton's decreased deep-tendon reflexes throughout, with 1/4 at the left and 1/2 at the right biceps, 1/2 bilaterally at the triceps, 1/4 at the left and 1/2 at the right brachioradialis, 1/4 on the left and 1/2 at the right patella, and 1/2 bilaterally at the Achilles. Id. He gave the same diagnoses as in her previous December visit. See R. 252–53, 271.

### 3. Dr. Allan Weissman

Dr. Weissman treated Horton on nine visits between April 25, 2016, to March 15, 2017. R. 365–88, 404–08, 464–68, 469–73. His pre- and post-operative diagnoses included lumbar paravertebral facet joint disease, lumbar disc displacement, lumbar radiculopathy, myalgia, paravertebral facet joint disease, and lumbar facet joint syndrome. Id. Throughout the visits he performed lumbar epidural steroid injections at the L4-5 vertebra, lumber paravertebral facet joint block bilaterally at the T9-10, T10-11, T11-12 vertebrae spacings, trigger point injections bilaterally at the lumber and cervical paraspinal muscles, lumbar transforaminal steroid injection

---

[1] Additionally, Dr. Burt noted that the C7 dermatomes were normal bilaterally, contradicting his note that they were decreased on the right. R. 271.

under fluoroscopy, and left facet joint radiofrequency denervation at the L4, L5, sacral ala, and S1 vertebrae.[2] Id. On December 19, 2016, Dr. Weissman wrote that Horton should not lift more than 10–20 pounds, and she was discouraged from frequent bending, prolonged sitting and standing, and activities requiring mobility. R. 420.

Horton also saw either Dr. Weissman or his physician's assistant on 14 occasions between March 28, 2016, and April 19, 2017. R. 412–26, 435–440, 450–453, 476–497. They noted that Horton had marked tenderness and muscle spasms over the cervical, thoracic, and lumbar spine, and bilaterally at the trapezius. Id. She had decreased muscle strength bilaterally at the shoulder abductors and hip extensors. Id. She also had several positive bilateral SLR tests. Id. Dr. Weissman variously diagnosed Horton with intervertebral disc disorders with radiculopathy in the thoracic region, cervical disc disorder with radiculopathy at the mid cervical region, intervertebral disc disorder with radiculopathy at the lumbar region, cervicalgia, low back pain, thoracic spine pain, and muscle spasm of the back. Id. He noted throughout the various visits (and after performing the various procedures) that Horton experienced temporary but not long-lasting relief, and no restored functional abilities. Id.

### 4. Dr. Eugene Gorman[3]

On April 25, 2016, Dr. Gorman performed an epidurography and lumbar epidural steroid injection on Horton. R. 474–75. His pre- and post-operative diagnoses were lumbar disc displacement, lumber radiculopathy, and general radiculopathy. Id.

---

[2] Radiofrequency denervation, also known as radiofrequency ablation, uses an electric current to heat up a small area of nerve tissue to stop it from sending pain signals. See Cleveland Clinic, Radiofrequency Ablation, available at https://my.clevelandclinic.org/health/treatments/17411-radiofrequency-ablation.
[3] Dr. Gorman's procedures were misidentified as Dr. Weissman's procedures in the Plaintiff's brief.

### 5.  Dr. Alexandr Zaitsev

On March 29, 2017, Dr. Zaitsev performed a lumbar transforaminal steroid injection on Horton. R. 409–11. He gave pre- and post-operative diagnoses of lumbar disc displacement, lumbar radiculopathy, and myalgia. Id.

### 6.  Dr. David Payne

On November 17, 2015, Dr. Payne conducted an MRI of Horton's cervical spine. R. 462–63. The MRI showed a bulging disc at Horton's C3-4 vertebra, with thecal sac impingement; central herniation at the C4-5 vertebra with cord impingement; right paracentral herniation at C5-6 vertebra with cord impingement; and bulging disc at C6-7 without stenosis. Id.

### 7.  Dr. Paul Babitz

On November 23, 2015, Dr. Babitz performed an electrodiagnostic report on Horton. R. 324–29. Horton exhibited higher than average sensitivity at the left C5 axillary nerve and left C8 ulnar nerve (mild); at the left C6 radial nerve lateral branch (moderate); and at the right T2 second thoracic nerve (very severe). R. 327. He additionally found reduced nerve sensitivity at the right C2 greater occipital nerve (hyper) and right C7 radial nerve medial branch (hyper). Id. He recommended further nerve fiber testing of the cervical and upper extremity nerves to locate the precise position of nerve root pathology. R. 329.

On November 30, 2015, Dr. Babitz conducted another electrodiagnostic study on Horton. R. 338. He found mild right saphenous nerve measures and right post femoral cutaneous nerve measures, moderate right sural nerve measures, and severe left post femoral cutaneous nerve measures. Id. Further lumbar/lower extremity pain fiber testing was prescribed. Id. On December 16, 2015, Dr. Babitz performed physical capacity testing on Horton. R. 248–51. He found that her demonstrated isometric lifting capacity was below 25% as compared to the normal

9

population in arm lift, high far lift, high near lift, torso lift, leg lift, and floor lift. R. 249. He performed similar testing on March 23, and May 18, 2016, with similar findings. R. 290–93, 305–308.

### 8. Dr. Marc Katzman

On January 27, 2017, Dr. Katzman conducted MRIs of Horton's cervical and lumbar spine. R. 397–400. Her cervical MRI showed persistent straightening of the normal cervical lordosis; C3-4 stable subligamentous disc bulge impression on the ventral cord; C4-5 stable broad central disc herniation impression on the ventral cord; C5-6 stable broad paracentral subligamentous disc herniation impressing on the central cord; and C6-7 stable subligamentous disc bulging. R. 398. Her lumbar spine MRI showed stable partial straightening of the normal lumbar lordosis in the sagittal plane, with stable peripheral disc bulging at the L2-3; stable peripheral disc bulging with encroachment on the neural foramina at the L3-4; and stable subligamentous disc bulging at the L4-5 vertebrae. R. 399–400.

### 9. Physician's Assistant Krishna Patel

On March 2, 2017, Patel examined Horton under the supervision of Dr. Gorman for complaints of pain in her neck and back related to her car accident, which she described as sharp and throbbing, and interfered with her sleep and daily activities. R. 435–37. She described 8 of 10 pain in her neck, 9 of 10 in her midback, and 10 of 10 in her lower back, as well as numbness, tingling, and weakness in the left leg. R. 435. Her pain increased with standing, sitting, working, driving, lifting, and bending. Id. Patel noted that Horton walked with an antalgic gait using a cane. Id.

Patel's exam revealed marked tenderness over the cervical spine, thoracic spine, and lumbar spine; bilateral muscle spasms in the cervical paraspinals, trapezius, lumbar paraspinals,

gluteus, and quadriceps; and muscle spasm in the right rhomboid. R. 435–36. Horton had a positive cervical compression test, positive Soto Hall test, and positive bilateral SLR. Id. She had decreased muscle strength bilaterally at the shoulder abductors, and at the right hip flexor and extensor. Id. Cervical flexion was limited to 25 degrees; extension to 25 degrees, right and left rotation to 60 degrees, left and right tilt to 25 degrees. Id. Lumbar flexion was limited to 15 degrees; extension to 10 degrees; right rotation to 10 degrees; left rotation to 25 degrees; right lateral to 5 degrees; and left lateral to 10 degrees. Id. Horton exhibited tenderness at the C5-6, C6, C7-T, L3-4, L4-5, L5-S1, T9-10, T10-11, and T12-L1 vertebrae. Id.

On March 15, 2017, Patel diagnosed Horton with intervertebral disc disorders with radiculopathy in the thoracic and lumbar regions, cervicalgia, low back pain, pain in the thoracic spine, muscle spasm of the back, and cervical disorder at the C4-5, C5-6, and C6-7 vertebrae, with radiculopathy. R. 437, 439. She recommended a lumbar transforaminal injection for pain management.

### 10. Dr. Douglas Schwartz

Dr. Schwartz treated Horton on 10 occasions from October 5, 2016, to August 1, 2018. R. 448–49, 455, 457, 733–48. He variously diagnosed Horton with cervical derangement with myofasciitis, with probable underlying radiculopathy and/or herniated discs; lumbosacral derangement with myofasciitis and probable underlying radiculopathy; bulging L2-3 disc with biforaminal impingement upon exiting L2 root; bulging L3-4 disc with biforaminal impingement upon exiting L3 root; and bulging L4-5 disc. R. 429–30, 431–32, 433–34. He opined that she was totally disabled from work. See, e.g., R. 430.

On January 3, 2017, Dr. Schwartz examined Horton for complaints of residual pain exacerbations persisting throughout the neck and lower back, mainly on the left side, with

referred pain, numbness, and tingling intermittently in the left arm and leg. R. 733. She exhibited intolerance to prolonged sitting and standing positions, walking short distances, and climbing and descending stairs. Id. She suffered interrupted sleep, took Zorvolex and Lidoderm for pain, and Amrix for muscle spasms. Id. She walked with a mildly antalgic gait, offloading the left leg without an assistive device, and demonstrated mild difficulty in heel and toe walking. R. 734.

His examination revealed pain on palpation bilaterally at the cervical and lumbosacral paraspinal trigger point, and spasms (greater on the left than right) bilaterally at the trapezii and upper gluteal regions. R. 733. Horton showed reduced cervical flexion at 20 degrees; extension to 15 degrees; lateral bending to 20 degrees at the left and 15 degrees at the right; and decreased lumbar flexion to 25 degrees and extension to 10 degrees. R. 734. Horton exhibited diminished sensation in the C5, C6, L4, and L5 dermatomes; diminished muscle grade strength at 4 of 5 in the cervical and lumbosacral paraspinals; and reduced deep tendon reflexes at 1/2 throughout the bilateral upper and lower extremities with the exception of 1/4 at the left biceps and Achilles. Id.

Furthermore, Horton exhibited positive Spurling tests on the left showing cervical root irritation; positive SLR tests at both the seated and supine positions on the left, with positive increase Bragard/Valsalva testing indicating lumbosacral nerve root irritation. Id. She also exhibited pain on palpation bilaterally at the bladder Meridian points, and C2, C4, C6, T2, L2, L4, S2, and S4 vertebrae. Id. Dr. Schwartz made similar findings on May 4, 2017, June 29, 2017, and August 1, 2018. See R. 735–36, 745–46, 747–48.

On August 1, 2018, Dr. Schwartz performed a nerve-conduction study on Horton that revealed evidence of LT, C6, L4, L5, and S1 radiculopathy. R. 276. Denervation was noted to the LT extensor carpi radialis brevis, tibialis anterior, extensor hallucis longus, and medial gastrocnemius muscles. R. 726. He noted reduced amplitudes and prolonged distal latencies on

nerve conduction. Id. He had technical difficulties, however, obtaining bilateral peroneal, tibial, and F-wave studies. Id.

Finally, on September 11, 2018, Dr. Schwartz issued a medical source statement. R. 749. He marked that Horton could occasionally/frequently lift less than ten pounds; that she was limited in standing and/or walking and required a hand-held assistive device for walking; that she required periodic alternate sitting and standing to relieve pain or discomfort; and that she was limited in pushing and pulling with both her upper and lower extremities. R. 749–50. He marked that she should never balance, kneel, crouch, crawl, or stoop, and should avoid ramps, ladders, ropes, and scaffolding, but could occasionally climb stairs. R. 750. She could occasionally reach, handle, finger, and feel, but with limitations; and her exposure to vibration, humidity/wetness, and hazards such as machinery and heights should be limited.[4] R. 751.

### 11. Dr. Merritt Kinon

On November 1, 2016, Horton saw Dr. Kinon for a neurosurgery consultation. R. 659–669. She complained of neck and back pain, which came on suddenly and radiated down both legs. R. 659. He found that she was positive for myalgias, back pain, and arthralgias. R. 660. His examination revealed full strength in the upper and lower extremities, intact sensation to light touch throughout, and no abnormal reflexes. R. 661. He reviewed her 2015 MRIs, which he indicated showed multilevel degenerative changes throughout, but did not exhibit significant stenosis, any deformity, or abnormal cord signal. Id. He found lumbago or lumbar region sciatica and recommended that she may benefit from a spinal cord stimulator evaluation and referred her to a pain management specialist. Id. He recommended treating her symptoms conservatively. Id.

---

[4] Throughout Dr. Schwartz's medical source statement, he noted "see attached report." See e.g., R. 749 (writing "See attached report" next to "What medical/clinical finding(s) support your conclusion in item 1-4 above?"). It is unclear to the Court which report in the record this is in reference to.

### 12. Dr. Sayed Emal Wahezi

On November 1, 2016, Dr. Wahezi saw Horton, under the supervision of Dr. Kyle Silva, following Dr. Kinon's referral for pain management. R. 670–681. He noted Horton's subjective complaints of neck and back pain without a corroborating physical examination or radiographic evidence. R. 671. He wrote that Horton was not a candidate for injection therapy, and that she should continue to see her pain management physician (Dr. Weissman) for conservative pain management. Id. His examination found normal manual muscle testing of the bilateral upper and lower extremities; intact sensation and symmetrical appreciation to light touch; normal gait without an assistive device; and a negative Spurling's test. R. 676. He found tenderness to palpation along the cervical paraspinals and trapezius. Id.

### 13. Dr. Elina Spektor, Ph.D.

On May 5, 2017, Horton saw Dr. Spektor for a psychological evaluation. R. 441–443. She wrote that Horton's responses to the Beck Depression Inventory-II indicated moderate-to-severe depression. R. 442. Horton reported sadness, pessimism, anhedonia, feelings of guilt, periods of crying, self-criticism, self-disappointment, agitation, loss of interest, indecisiveness, worthlessness, loss of energy, sleep disturbance, loss of libido, fatigue, impaired concentration, disturbed appetite, and irritability. Id. Dr. Spektor also found Horton to exhibit severe anxiety, which interfered with her daily activities and resulted in poor responses to her routine tasks and activities. Id. She wrote that Horton's chronic pain affected her both physically and mentally, resulting in significant physical, emotional, and social consequences. Id.

Dr. Spektor diagnosed Horton with major depressive disorder (single episode, unspecified) and pain disorder with related psychological factors. R. 443. She wrote that Horton would benefit from ongoing psychological treatment to help cope with the psychological

sequelae of her car accident. Id. She indicated that she would provide Horton with a program of psychological pain-stress management to help her cope in the event that her physical condition did not resolve over time. Id.

In a June 21, 2017 letter describing a follow-up evaluation, Dr. Spektor wrote that Horton scored in the mild range on the Beck Hopelessness scale. R. 444. Her scores across the four Brief Symptom Inventory scales were above the 93rd percentile—with the average cut-off at the 50th percentile—indicating significant stress. R. 445. Her responses to the Quality of Life Inventory indicated very low life satisfaction. Id. Dr. Spektor noted that Horton was extremely unhappy and unfulfilled, lacked enthusiasm, and felt that her life lacked meaning and purposes. Id. Additionally, she showed a low level of self-efficacy and lacked confidence in her ability to exert control over her environment. Id. She showed heightened scores across the Cognitive Distortion Scale, indicating elevated self-criticism, self-blame, helplessness, hopelessness, and preoccupation with danger. R. 445–46. Dr. Spektor again diagnosed major depressive disorder and pain disorder. R. 447.

### 14. Dr. Robert Rook, D.C.

Horton visited Dr. Rook for chiropractic treatments on 24 occasions from October 14, 2015, through January 11, 2016. R. 272–86, 310, 330–35, 338–41. He diagnosed her with cervical sprain/strain and thoracic sprain/strain. See R. 310. He prescribed her a cushion massager, lumbar pneumatic traction pump, hammer massager, EMS unit, and pump collar. R. 309–12.

### 15. Activepro/Bronxwide Physical Therapy[5]

From October 21, 2015, through May 31, 2017, Horton attended 101 sessions of physical therapy at Activepro/Bronxwide Physical Therapy.[6] R. 242–247, 267–69, 288–89, 393–396, 401–403, 498–523. For 100 of 101 visits, the records note Horton's pain at 8 of 10, with one record not having any notation on the pain scale. Id. Similarly, at every visit the physical therapist noted that Horton presented with tenderness, muscle spasm, and limitation of motion; she was always treated with a hot pack, electrical stimulation, and therapeutic exercise. Id. Additionally, they always marked that Horton responded well to treatment and was felt better after treatment.[7] Id. Despite these notations, her pain and presentments remained constant. Id.

## C. Consultative Medical Opinion Evidence

### 1. Dr. Allen Meisel

On September 23, 2016, Horton saw Dr. Meisel for an independent consultative medical examination. R. 389–91. He noted Horton's complaints of lumbar and cervical back pain at 10 of 10, and that she was unstable when standing and had knee-buckling. R. 389. She reported needing help dressing, especially putting on her shoes, socks, and pants. Id. He wrote that Horton did not appear to be in acute distress, presented a normal gait, and could walk on her heels and toes without difficulty. R. 390. She could fully squat, had a normal stance, but used a cane

---

[5] Activepro Physical Therapy rebranded as Bronxwide Physical Therapy at some point during Horton's treatments. Its treatment forms, logo, and office address remained consistent, however, and her treatment records were signed with the same initials. Therefore, they are treated as one entity for the purposes of clarity in this review.

[6] The record reflects that Horton attended physical therapy on:

- 2015: Oct. 21, 24, 26, 28, 31; Nov. 2, 4, 6, 9, 11, 13, 16, 18, 20, 23, 30; Dec. 7, 9, 16, 18, 29, 30.
- 2016: Jan. 4, 11, 19, 21, 22, 26; Mar. 4, 7, 8, 11, 14, 16, 22, 23, 24, 28, 30; Apr. 1, 11, 18; May 2, 4, 11, 13, 17, 25, 26; Jun. 2, 3, 21, 29; Jul. 4, 7, 12, 13, 15, 25, 27; Aug. 3, 8, 11, 14, 19, 26, 29; Sep. 8, 15, 19, 23, 27; Oct. 3, 7, 21, 24; Nov. 4, 7, 10, 14, 18, 21; Dec. 2, 9, 19.
- 2017: Jan. 3, 12, 17, 24, 26; Feb. 3, 22; Mar. 2, 21; Apr. 13, 20, 25; May 10, 23, 25, 31.

[7] Several records also have handwritten notes. Unfortunately, their content is indecipherable.

(though he noted it was not medically prescribed), which in his opinion was not medically necessary. Id. She did not need help getting on and off the exam table and was able to rise from the chair without difficulty. Id.

Dr. Meisel noted no decrease in the range of motion in the cervical spine; no scoliosis, kyphosis, or abnormality in the thoracic spine; full range of motion in the lumbar spine; negative SLR bilaterally; full range of motion in the hips, knees, and ankles bilaterally; no evident subluxation, contractures, ankylosis, or thickening; stable joints, and no redness, heat, swelling, or effusion. R. 390–91. He noted no sensory deficits and full strength in the upper and lower extremities. R. 391. He diagnosed Horton with cervical back pain, lumbar back pain, hypertension, and asthma. Id. He recommended she avoid exposure to smoke, dust, and other respiratory inhalants. Id.

### 2. Dr. Carl Wilson

On February 24, 2016, Horton visited Dr. Wilson for an independent orthopedic medical examination. R. 239–41. Dr. Wilson wrote that Horton ambulated with ease. R. 240. His examination of the cervical spine revealed no muscle tightness and no focal tenderness; flexion was to 50 degrees; extension to 35 degrees; right and left bending to 25 degrees, right and left rotation to 60 degrees; she had a negative Spurling's test; active and symmetric upper extremity deep tendon reflexes; no distal motor weakness; and intact strength in the upper extremities. Id. His examination of the lumbosacral spine revealed no tenderness; no muscle tightness; no sciatic notch irritability; flexion at 70 degrees with good mobility; extension at 10 degrees; and right and left bending at 15 degrees, with good relaxation of the ipsilateral muscles. Id. Horton exhibited a negative SLR bilaterally and her patellar and Achilles deep tendon reflexes were active and symmetric. Id.

17

Dr. Wilson diagnosed Horton with resolved strain of the cervical and lumbosacral spine, causally related to her car accident. Id. He found that maximum medical improvement had been achieved, that she required no surgery, and that there was no evidence of disability. Id. He wrote she could return to her usual and customary work activity at full duty. Id.

## IV.    The ALJ's Decision

On November 19, 2018, the ALJ denied Horton's application. R. 10–17. The ALJ laid out the administrative and procedural history, the applicable law, and her findings of fact and conclusions of law. Id. At step one, the ALJ determined that Horton met the insured status requirements of the Act through December 31, 2020, and that she had not engaged in any substantial gainful activity since October 14, 2015. R. 12. At step two, she found that Horton's degenerative disc disease of the lumbar spine qualified as a severe impairment, and that she had non-severe asthma and hypertension. Id. At step three, she determined that her impairments did not equal the severity of Listing 1.04. Id. The ALJ wrote that Horton did not meet subsection A because there was no evidence of nerve root compression; she did not meet subsection B because there was no finding of spinal arachnoiditis; and she did not meet subsection C because there was no evidence that Horton could not ambulate effectively. See R. 13; 20 C.F.R. Pts. 404.1520(d), 4040.1525, and 404.1526.

Before step four, the ALJ determined that Horton had the residual functional capacity ("RFC") to perform sedentary work with limitations, including no exposure to pulmonary irritants, the ability to sit and stand at will, being able to sit for 15 minutes at a time, standing and walking for 30 minutes at a time, carrying less than 10 pounds, following short and simple instructions, performing short and simple repetitive tasks, the ability to be off-task for 10% of the

workday, having no strict deadlines, having no high production quotas, and requiring a cane for ambulation. See R. 13; 20 C.F.R. § 404.1567(a).

At step four, the ALJ determined that Horton could not perform her prior work but at step five, the ALJ concluded that there were numerous jobs available in the national economy for Horton to perform. R. 16–17. This was based upon an evaluation of her age, education, work experience, RFC, and testimony of the vocational expert. Thus, because the ALJ found that Horton was able to engage in substantially gainful activity, the ALJ concluded that she had not been disabled through the applicable period and was not entitled to benefits. R. 17.

## V.    The Appeals Council's Determination

Following the ALJ's unfavorable decision, Horton requested the Appeals Council's review. See R. 24–28. On July 31, 2019, the Appeals Council denied her request, making the ALJ's decision the final agency decision. See R. 1–6.

DISCUSSION

## I.    Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). An ALJ's determination may be set aside only if it is based upon legal error or it is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Balsamo v. Chater, 142 F.3d 75, 79 (2d Cr. 1998)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The

Commissioner's findings as to any fact supported by substantial evidence are conclusive. <u>Diaz v. Shalala</u>, 59 F.3d 307, 312 (2d Cir. 1995); <u>see also</u> <u>Alston v. Sullivan</u>, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Therefore, if substantial evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if substantial evidence also supports the plaintiff's position. <u>See</u> <u>Brault v. Soc. Sec'y Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would <u>have to conclude otherwise</u>.") (emphasis in original) (citations and internal quotation marks omitted). Although deferential to an ALJ's findings, a disability determination must be reversed or remanded if it contains legal error or is not supported by "substantial evidence." <u>See</u> <u>Rosa</u>, 168 F.3d at 77.

## II.      Definition of Disability

A claimant is disabled under the Act if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> § 423(d)(3). A claimant will be found to be disabled only if her "impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." <u>Id.</u> § 423(d)(2)(A).

20

An ALJ must proceed through a five-step process to make a disability determination. See 20 C.F.R. § 404.1520. The steps are followed in order; if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. See 20 C.F.R. § 404.1520. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)).

A claimant bears the burden of proof as to steps one, two, three, and four; the Commissioner bears the burden as to step five. Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (citation omitted).

## III.   The ALJ's Application of the Five-Step Analysis

Horton argues that the ALJ committed legal and factual errors in finding that she was not entitled to disability benefits. First, Horton contends that she qualified as disabled as a matter of law under Listing 1.04A because she showed, among other things, evidence of nerve root compression, which the ALJ contested. See R. 222. Additionally, she argues that the ALJ failed: (1) to consider Horton's need for an assistive device on her ability to perform sedentary work; (2) to consider that her persistent efforts to obtain pain relief bolstered her credibility; and (3) to evaluate properly the opinions of her treating physicians. Horton further argues that the ALJ's

21

decision was not supported by substantial evidence. See ECF No. 12. The Commissioner

contends that the ALJ's decision is free of legal error and supported by substantial evidence, and

therefore should be affirmed. See ECF No. 15 at 1. The Court proceeds through Horton's

arguments at each step. As a preliminary matter, the ALJ's findings at Steps One and Two are

uncontested and require no further discussion.

### A.   The ALJ's Evaluation of Listing 1.04A at Step Three

Disorders of the spine are evaluated under Listing 1.04. See 20 C.F.R. Part 404, Sub. P,

App'x 1 § 1.04 [hereinafter "List. 1.04"]. These include (but are not limited to) herniated nucleus

pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet

arthritis, or vertebral fractures. See List. § 1.04. To qualify as disabled under Listing 1.04A, the

claimant must show some diagnosed spinal disorder, with: (i) evidence of nerve root

compression characterized by neuro-anatomic distributions of pain; (ii) limitation of motion of

the spine; (iii) motor loss (atrophy with associated muscle weakness or muscle weakness)

accompanied by sensory or reflex loss; and, if there is involvement of the lower back, (iv)

positive straight-leg raising test (sitting and supine). Id.

Horton argued that the evidence she submitted showed that her impairments met Listing

1.04A, meriting a finding that she was disabled as a matter of law. The ALJ found, however, that

Horton did not qualify under Listing 1.04A because there was "no evidence of nerve root

compression." R. 13. Here, the ALJ's determination is nearly identical to that in Abualteen v.

Saul, where that ALJ merely proceeded through the Listing 1.04A criteria without "provid[ing]

any real explanation for these determinations, beyond stating that Plaintiff had not demonstrated

that he met each Listing's criteria." No. 19-cv-02637 (DF), 2020 WL 5659619, at *23 (S.D.N.Y.

Sep. 23, 2020). As was true in that case, "conflicting evidence left unaddressed by the ALJ

renders the Court unable to conclude that the ALJ's decision . . . was supported by substantial evidence." Id. (citing Singleton v. Astrue, No. 08-cv-02784 (SCR) (PED), 2009 WL 6325521, at *6 (S.D.N.Y. Aug. 13, 2009)).

Accordingly, the Court examines the evidence relevant to Listing 1.04A below. As a threshold matter, the ALJ did not contest that Horton was diagnosed with a spinal disorder—indeed, she found that Horton suffered from degenerative disc disease of the lumbar spine at step two. See R. 12. As such, the Court proceeds to subpart (A) and its listed criteria.

### 1. Evidence of Nerve Root Compression

The first requirement under Listing 1.04A is "evidence of nerve root compression characterized by neuro-anatomic distribution of pain." List. 1.04. There is overwhelming evidence of Horton's complaints of neck and back pain that radiated to her shoulders, upper and lower back, and upper and lower extremities, as well as regional cervical, lumbar, and thoracic pain, and numbness. See, e.g., R. 71 (describing shooting pains down her back akin in intensity to "labor pains"), 188–89 (describing her inability to sleep due in part to radiating leg pain, and neck and back spasms), 252–53 (complaining of severe cervical spine pain that radiated bilaterally to the shoulders, lumbar pain that radiated bilaterally to the feet and buttocks), 389 (describing severe pain in the cervical and lumbar spine), 435 (describing severe pain in her neck, mid and low back, and numbness, tingling, and weakness in her left leg), 733 (describing pain, numbness, and tingling intermittently in left arm); see Norman v. Astrue, 912 F. Supp. 2d 33, 78 (S.D.N.Y. 2012) (finding evidence of neuro-anatomic pain where plaintiff complained of radiating pain in neck, shoulder, lower back, and legs); Muntz v. Astrue, 540 F. Supp. 2d 411, 420 (W.D.N.Y. 2008) (finding evidence of neuro-anatomic pain where the plaintiff complained of back pain with radiating numbness and weakness).

23

In addition, Horton's subjective complaints of pain evidencing possible nerve root compression were substantiated through multiple examinations, objective testing, and diagnoses spanning several years and by numerous treating doctors, that revealed percussion tenderness; muscle spasming; positive Spurling's test; cervical, thoracic, and lumbar radiculopathy[8]; and disc herniation at the cervical, thoracic, and lumbar spine. See, e.g., 242–47, 252–53, 271, 412–26, 435–40, 450–53, 476–97, 734. This included MRIs that revealed straightening on the spine; C3-4, C6-7, L2-3, L3-4, and L4-5 vertebrae disc bulges; and C4-5 and C5-6 vertebrae herniation. See, e.g., R. 252–53. Perhaps most important was Dr. Katzman's MRI findings of disc bulge impression on the ventral and central cords. See 397–400.

Accordingly, both Horton's subjective complaints of neuro-anatomic distribution of pain, combined with objective assessments and examinations that plainly relate to possible nerve root compression evidence the first requirement of Listing 1.04A. See Norman, 912 F. Supp. 2d at 79 (finding that subjective complaints combined with diagnosed cervical and lumbar radiculopathy, among other diagnoses, met the first criterion); Abualteen, 2020 WL 5659619, at *24 (finding that "a diagnosis of radiculopathy [can serve] as a basis for satisfying the first [Listing 1.04] subcriterion." (citing McIntosh v. Berryhill, No. 17-cv-05403 (ER) (DF), 2018 WL 4376417, at *20 (S.D.N.Y. Jul. 16, 2018), adopted by, 2018 WL 4374001 (S.D.N.Y. Sep. 12, 2018)); Posey v. Saul, No. 19-cv-04578 (PKC), 2020 WL 4287359, at *3 (E.D.N.Y. Jul. 27, 2020) (finding that disc herniation, among other diagnoses, supported an inference of nerve root compression).

---

[8] Radiculopathy describes a range of symptoms produced by the compression of a nerve root in the spinal column. The pinched nerve at issue can be at either the cervical, thoracic, or lumbar spine. See *Radiculopathy*, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy.

Based on this extensive evidence in the record, the Court finds substantial evidence that Horton met the first sub-criterion.

### 2. Limitation of Motion of the Spine

The second requirement under Listing 1.04A is "limitation of motion of the spine." List. 1.04. Again, objective evidence throughout the record showed that Horton had a limited range of motion in the cervical spine, including of limited extension, bilateral flexion, and rotary movement. See, e.g., 435–36, 734. Treatment records also note tenderness and muscle spasm in the area of the spine and surrounding area, with pain associated with motion. See, e.g., 188–89, 252–53, 435–39, 733. Finally, the record shows that Horton had mild difficulty in heel and toe walking. See, e.g., R. 734. Based on this evidence, the Court finds substantial evidence that Horton met the second sub-criterion.

### 3. Motor Loss of the Spine

The third requirement under Listing 1.04A is "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." List. 1.04. First, Horton's treatment records indicate that she experienced sensory loss and reflex loss as a result of her spinal injuries, exhibiting multiple findings by different treating doctors of deep-tendon reflex loss in particular. See, e.g., 272, 734. Additional reflex loss was shown through multiple positive SLR tests in both the supine and seated positions by multiple examiners. See, e.g., 435, 450–53, 476–497, 734, 735–36, 745–46, 747–48.[9] Finally, other examinations showed decreased sensitivity at Horton's C5 dermatome on the right, decreased sensory loss and numbness, and

---

[9] The Court notes that Horton was required only to show positive SLR tests in both the seated and supine positions regarding her lower-back injuries under Listing 1.04A—even if such tests were excluded from the record, she presented enough evidence of her cervical spine injuries for the ALJ to determine that she met each of the requirements under the Listing.

decreased upper and lower extremity strength. See, e.g., 324–29, 412–26, 435–40, 450–53, 476–97, 734. Based upon this evidence, the Court finds substantial evidence that Horton met the final sub-criterion.

### 4. Appropriateness of Remand

Generally, courts require ALJs to explain why a claimant did not meet or equal a listing where the medical evidence appears to match the symptoms described in the Listings, however, "a Court may still uphold the ALJ's determination if it is supported by substantial evidence." Rockwood v. Astrue, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009) (citing Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982)). "[I]t is the ALJ's responsibility," however, "to build an accurate and logical bridge from the evidence to [his or her] conclusion to enable meaningful review." Loescher v. Berryhill, No. 16-cv-300 (FPG), 2017 WL 1433338, at *3 (W.D.N.Y. Apr. 24, 2017) (quoting Hamedallah ex rel. v. Astrue, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012)).

Although the ALJ referenced the first Listing 1.04A criterion at Step Three, she did not provide any real analysis to bridge the relevant evidence to her determinations. The ALJ *did* discuss some of the evidence of nerve root compression at Step Four, however, describing some of the MRI findings that evidenced cervical disc herniation and disc bulge. See R. 15. Perplexingly, despite raising this objective evidence (and without finding that it was not credible) the ALJ still determined that there was no evidence of root compression.

To be sure, both Dr. Meisel and Dr. Wilson—the two consultative examiners—provided some evidence tending against a finding that Horton met the Listing 1.04A criterion, some of which the ALJ discussed. See R. 14. But "[i]n light of evidence that favors a finding that the listing was met, the ALJ must provide an explanation of his reasoning as to why he believes the requirements are not met and explain the credibility determinations and inferences he drew in

26

reaching that conclusion." Perozzi v. Berryhill, 287 F. Supp. 3d 471, 486 (S.D.N.Y. 2018) (quotation omitted). Of the 17 physicians and practitioners who either treated or evaluated Horton's injuries—several of whose findings bore directly on the Listing 1.04A criteria—the ALJ only made credibility findings for the two consultative examiners and two treating physicians. See R. at 15. The ALJ's truncated analysis at Step Three deprived the Court of insight as to why she chose to rely on certain evidence favoring a finding that Horton did not have a Listing-level impairment, as opposed to other evidence which would have supported a finding of disability. See Abualteen, 2020 WL 5659619, at * 27 (finding that remand was appropriate for the ALJ to resolve the conflicting evidence); see also McIntosh, 2018 WL 4376417 at *23 (same). It is possible that the ALJ would have determined that Horton did not meet or equal Listing 1.04A, however, "this possibility does not relieve the ALJ of [her] obligation. . . to provide plaintiff with an explanation of [her] *reasoning* as to why the plaintiff's impairments did not meet" the Listing. Norman, 912 F. Supp. 2d at 81 (emphasis added).

This is consistent with the directives of the Court of Appeals, which has noted that where "credibility determinations and inference drawing is required of the ALJ," remand is appropriate to allow the ALJ to explain her reasoning. Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982); see Ryan v. Astrue, 5 F. Supp. 3d 493, 507–08 (S.D.N.Y. 2014) (collecting post-Berry cases to conclude that remand is appropriate "where the evidence on the issue of whether a claimant meets or equals the listing requirements is equipoise" but the ALJ fails to explain his reasoning).

Accordingly, upon remand the ALJ should assess whether Horton meets Listing 1.04A, and if she reaffirms her prior conclusion, she should provide "a clearer explanation" for that decision. Berry, 675 F.2d at 469.

### B. The ALJ's RFC Determination at Steps Four and Five

#### 1. The ALJ's Evaluation of Horton's Use of an Assistive Device

Horton argues that the ALJ made several errors at Step Four when determining her RFC.

First, she claims that the ALJ committed reversible error by failing to consider the impact of her need for an assistive device on her ability to perform sedentary work. She cites a Social Security Ruling for the proposition that, in order to perform the full range of sedentary work, a claimant must be able to walk and stand for a total of "no more than about 2 hours of an 8-hour workday," and that "the occupational base for an individual who must use [an assistive] device for balance because of significant involvement of both lower extremities (e.g., because of neurological impairment) may be significantly eroded." SSR 96-9P, 1996 WL 374185, at *3, 7 (S.S.A. Jul. 2, 1996). That same opinion, however, clarifies that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.'" Id. at *1. Indeed, the relevant question is whether given the additional limitations, "there is other work in the national economy that the individual is able to do." Id.

Horton argues that the ALJ failed to consider that she needed a cane to walk—but the ALJ specifically noted this limitation in her RFC determination. R. 13. Additionally, the ALJ's decision references the VE's testimony that, given all of Horton's additional limitations, she would still be able to perform the requirements of a document preparer, a surveillance system monitor, and a credit checker. R. 17. That testimony included a sustained exchange about whether Horton's cane was necessary for ambulation, balance, or both, and the impact it would have on her ability to perform the above referenced jobs. R. 77–81.

Furthermore, the ALJ's determination that Horton required a cane to walk only, and not for balance, was supported by substantial evidence in the record, as noted by doctors Meisel and

Schwartz, and Physician's Assistant Patel. See R. 390, 435, 749. Indeed, the only contrary evidence in the record indicates that Horton did not require a cane to walk *at all*, not that she also needed a cane for balance. See, e.g., R. 734. Even Horton's own function report indicated that she did not use a cane or other assistive device. See R. 194. Accordingly, the Court finds that the ALJ properly considered use of an assistive device in arriving at her decision.

### 2. The ALJ's Evaluation of Dr. Schwartz's Opinions

Horton argues that the ALJ failed to properly evaluate Dr. Schwartz's reports by according his opinions only "partial weight." R. 15. She argues that, as her treating physician, Dr. Schwartz's opinions were entitled "great," if not "controlling" weight.

Because her application was filed before March 2017, the ALJ's decision must comply with the Treating Physician Rule, which required the ALJ to "either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them." Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (citing 20 C.F.R. § 404.1527([c])(2)). Indeed, the regulations provided that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion." 20 C.F.R. § 416.927 (c)(2). When the ALJ fails to provide a good reason for not giving the treating physician's opinion "controlling weight," remand is required unless adherence to the rule could have only led to the same conclusion. Zabala, 595 F.3d at 409. See also Urena v. Comm'r of Soc. Sec., 379 F. Supp. 3d 271, 280 (S.D.N.Y. 2019). "[W]hile a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence." Byam v. Barnhart, 336 F.3d 172, 183 (2d Cir. 2003) (internal quotation marks omitted).

To determine the appropriate weight to give a treating source's opinion, the ALJ should consider factors set forth in the regulations, which include: (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. See 20 C.F.R. § 416.927(c)(1)-(6).

Proceeding through the factors, Horton shows that Dr. Schwartz: (i) had a longitudinal picture of her medical conditions, having treated her from 2016 to 2018; (ii) prescribed her medications, referred her to specialists for pain management and psychological evaluations, performed nerve conduction tests, and provided her with home exercise therapy instructions (R. 427, 733, 735, 745, 747); and (iii) furthermore, the Court finds that his opinions regarding Horton's limitations were well-supported by diagnostic evidence and were not inconsistent with substantial evidence in the record. See, e.g., 749–52. Indeed, the ALJ noted many of the same limitations in the RFC finding. R. 13.

The Commissioner argues that the ALJ was not required to proceed through each regulatory factor in declining to give Dr. Schwartz's opinions controlling weight, because the ALJ thoroughly discussed the other record evidence, such as the less restrictive opinions of doctors Meisel and Weissman, and correctly rejected the portion of Dr. Schwartz opinions that opined on Horton's ultimate findings of disability, which are reserved to the Commissioner. See R. 15; 20 C.F.R. § 404.1527(d)(1); Halloran v. Barnhart, 363 F.3d 26, 32 (2d Cir. 2004). But rejecting Dr. Schwartz's ultimate opinion on Horton's disability status does not excuse the ALJ from considering the other various treating physician factors that would entitle the remainder of

his opinions to great or controlling weight. See Snell v. Apfel, 177 F.3d 128, 133–34 (2d Cir. 1999) (failure to provide "good reasons" is grounds for remand alone).

The Commissioner's argument that it was appropriate for the ALJ to give Dr. Schwartz's partial weight because it conflicted with the consultative examiner's opinion, which was given great weight, is exactly backwards—the treating physician rule required such conflicts to be resolved in favor of the treating physician. See Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988) (finding that even if a treating physician's opinion is contradicted by other substantial evidence, it is "entitled to some extra weight . . . because the treating source is inherently more familiar with a claimant's medical condition than are other sources."). As this Court has noted previously, "[a]lthough the conclusions of a consultative examiner may override those of a treating source . . . an ALJ should use care before relying too heavily on the findings of a one-time consultant." Diaz v. Commissioner of Social Security, No. 18-cv-08643 (SN), 2020 WL 1699996, at *12 (S.D.N.Y. April 8, 2020) (citing Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983); Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013)). This is because consultative examinations are "often brief, are generally performed without the benefit or review of [the] claimant's medical history and, at best, only give a glimpse of a claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." Cruz v. Sullivan, 912 F. 2d 8, 13 (2d Cir. 1990) (internal quotation marks and citation omitted).

Lastly, the Court notes that the ALJ committed error by weighting the opinions of both Dr. Schwartz and Dr. Weissman as "consistent with the . . . *residual functional capacity.*" R. 15 (emphasis added). SSA regulations provide that an ALJ must assess a claimant's credibility before evaluating her RFC, not the other way around. See Gernier, 6060 F.3d at 49 (citing 20

C.F.R. §§ 404.1529(a)-(b), 404.1512(b)(3); SSR 96-7P, 1996 WL 374186 (Jul. 2, 1996)); Cruz v. Colvin, 12-cv-07346 (PAC) (AJP), 2013 WL 3333040, at *16 (S.D.N.Y. Jul. 2, 2013). Dismissing a claimant's testimony based on its incompatibility with an RFC "gets things backwards" because it "implies that ability to work is determined first and then used to determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012).

In the exact same way, finding that a doctor's opinion is credible or not credible based on its consistency with the ALJ's RFC finding also "gets things backwards." Comparing medical opinions to the *objective medical findings* makes sense because inconsistencies can evidence a doctor's biases or a failure to review the record carefully. It is illogical, however, to find that an otherwise consistent opinion should not be afforded the proper weight because it contradicts the ALJ's ultimate conclusions. See Molina v. Colvin, 2014 WL 3446335, *14 (S.D.N.Y. Jul. 15, 2014) ("Determining the RFC first and then measuring the [doctor's] credibility by that yardstick reverses the standard in a way that is . . . prejudicial to the claimant."); Newman v. Berryhill, No. 16-cv-09325 (AJP), 2017 WL 4466615, at *19 (S.D.N.Y. Oct. 6, 2017) ("The Court in the past has criticized ALJ decisions that state an RFC determination and then state that medical evidence is consistent with the ALJ's RFC determination, a way of reasoning that puts the cart before the horse." (quotation marks and citation omitted)).

Because the ALJ both did not properly apply the treating source rule and evidenced an improper weighing of the opinion against the RFC, I find that remand is also appropriate to address the errors and provide a more fulsome analysis.

### 3. The ALJ's Credibility Determinations

Next, Horton argues that the ALJ erred in finding that her statements concerning the intensity, persistence, and limiting effects of her symptoms arising from his impairments were

not consistent with the medical evidence and other evidence in the record. She contends that the ALJ failed to consider many of the various factors set forth in the regulations required to assess a claimant's credibility. See C.F.R. 404.1529.

The regulations lay out a two-step process for assessing a claimant's subjective complaints, the first of which is deciding is the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. See 20 C.F.R. § 404.1529(b). At the second step:

> [T]he ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Grenier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (cleaned up). An "ALJ must make credibility findings" where the evidence concerning the claimant's symptoms conflicts. Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009). In making such determinations, an ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 97–7p, 1996 WL 374186, at *4 (S.S.A. 1996). The court gives "special deference" to the ALJ's credibility determinations, however, "because the ALJ [has] the opportunity to observe [the claimant's] demeanor" during a hearing. Marquez v. Colvin, No 12-cv-06819, 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013).

Here, the ALJ described the two-step process and discussed Horton's statements regarding her symptoms, restrictions, daily activities, and other relevant statements in the medical records. The Court notes, however, that much of the ALJ's examination of the record regarding Horton's abilities selectively gave weight to those portions which supported the RFC

finding, while ignoring contradicting portions. For example, when describing Horton's daily activities, the ALJ failed to account for her express limitations, writing that "throughout the relevant period, the claimant was able to drive a motor vehicle, take public transportation, care for her 8-year old daughter, and perform other activities of daily living." R. 15. Yet Horton testified that she could only drive perhaps 5–10 minutes per day, and often needed to switch with her brother or her older daughter because of extreme pain. See R. 59–61. Additionally, Horton testified that she *could not* care for many of her daughter's needs. Indeed, she testified that her eight-year-old daughter often prepared her own food and Horton's food—evidence that the young daughter cared for her mother, not the other way around. See R. 69–70. Horton also testified that it took her several hours to make her bed (a task she often abandoned), that she had difficulty washing small dishes, and that she needed help dressing.[10] See R. 65–67.

The ALJ also described conflicting evidence in the medical record regarding the causes and diagnoses related to Horton's symptoms. For example, she described Dr. Meisel's one-time examination of Horton, in which he found that Horton was in no acute distress, could walk on her heels and toes, could fully squat, and had an "essentially normal and musculoskeletal neurological examination without any deficits." R. 14. Yet an x-ray conducted at that same exam revealed straightening of the spine—a non-normal musculoskeletal finding. R. 14. Furthermore, the ALJ found that Dr. Weissman's opinions should be afforded "great weight." R. 15. Yet his examination findings conflicted substantially with those of Dr. Meisel, as did the objective MRI evidence showing multiple musculoskeletal deficits. R. 14–15. Despite these contradictions, the ALJ provided no reason as to why the conflicts were resolved against Horton's favor.

---

[10] The ALJ's omissions are parallel to those made in Gernier, which that court described as evincing "so serious a misunderstanding of [the claimant's] statements that it cannot be deemed to have complied with the requirement that they be taken into account." 606 F.3d at 50.

As a final example, in finding that Horton's statement's regarding her pain were inconsistent with the record, the ALJ noted (without further explanation) that "only conservative treatment modalities were recommended for her neck and lower back." R. 15. Inferring from the evidence in the record, the ALJ may have been referencing either Dr. Kinon's or Dr. Wahezi's one-time examinations noting that Horton was not a candidate for injection therapy, and that she should continue to seek conservative pain management. See R. 671. But these notes conflict with Horton's actual treatment history of repeated pain-relieving injections, as well as radiofrequency ablation surgery to cauterize several nerves in her spine for pain management. See, e.g., R. 407.

Indeed, the ALJ mentioned that Horton had consultations for more intensive spinal surgery but did not wish to proceed due to the risks involved.[11] See R. 14. Yet the ALJ failed to square this with her finding that "only conservative treatment" was recommended. To the extent that the ALJ relied upon Horton's refusal to undergo spinal surgery to make this finding without deciding if such a refusal was justified, that was error. See Pimenta v. Barnhart, No. 05-cv-05698 (JCF), 2006 WL 2356145, *6 (S.D.N.Y. Aug. 14, 2006) ("To the extent that the ALJ relief on [the claimant's] refusal to have surgery without determining whether [her] refusal was justifiable, the decision was in error."); Cahill v. Colvin, No. 12-cv-09445 (PAE) (MHD), 2014 WL 7392895, at *25 (S.D.N.Y. Dec. 29, 2014) (describing how a claimant's refusal to undergo spinal surgery due to the high risks involved "cannot be applied against [her] credibility or against [her] eligibility for disability benefits." (citing Benedict v. Heckler, 593 F. Supp. 755, 759 (E.D.N.Y. 1984); Schena v. Sec'y of Health & Human Serv., 635 F.2d 15 (1st Cir. 1980); Ratliff v. Celebrezze, 388 F.2d 978, 981 (6th Cir. 1964))).

---

[11] Horton testified that she was told that although the surgery might relieve her pain, there was only a 30% likelihood that she would be able to walk after the surgery. R. 64. She testified that this risk was too high, especially since it would make her more dependent upon her eight-year-old daughter. R. 65.

The Court of Appeals, and other circuit courts have made clear that administrative "cherry picking" of relevant evidence—crediting only that evidence which supports a specific administrative finding, while rejecting conflicting evidence—should be viewed with skepticism. See, e.g., Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing Fiorello v. Heckler, 725 F.2d 174, 175–76 (2d Cir. 1983)); see also Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011). Such a selective or incomplete recounting by the ALJ "can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." Younes v. Colvin, No. 14-cv-00170 (DNH) (ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) (citing Gernier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010)). The ALJ's selective embrace of the evidence necessitated a careful explanation of why she was giving precedence to some portions of the record; no explanation was given.

Accordingly, I find that the ALJ erred by failing to explain her credibility determinations when evaluating Horton's subjective complaints against the record. Upon remand, the ALJ will need to reevaluate the record and provide her reasoning as to her credibility determinations.

### 4. Horton's Remaining Arguments

Because the ALJ's errors necessitate remand, the Court does not reach Horton's remaining arguments that the ALJ's RFC determination was not supported by substantial evidence. See Johnson v. Bowen, 817 F.2d 983, 987 (2d Cir. 1987); see also Meadors v. Astrue, 370 Fed. App'x 179, 185–86 (2d Cir. 2010) (concluding that the ALJ's errors "in assessing the [claimant's] credibility . . . depriv[ed the court] of the ability to subject his RFC determination to meaningful review").

## CONCLUSION

Horton's motion is GRANTED, and the Commissioner's motion is DENIED. The matter is REMANDED for further proceedings consistent with this opinion. Within 30 days of the entry of this order, Plaintiff's counsel shall file any request for attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

Dated:  March 30, 2021
        New York, New York